1  Todd M. Friedman (SBN 216752)
   Adrian R. Bacon (SBN 280332)
2  LAW OFFICES OF TODD M. FRIEDMAN, P.C.
3  21031 Ventura Blvd., Suite 340
   Woodland Hills, CA 91364
4  Phone: 323-306-4234
5  Fax: 866-633-0228
   tfriedman@ toddflaw.com
6  abacon@ toddflaw.com
7  *Attorneys for Plaintiff*

8          **IN THE UNITED STATES DISTRICT COURT**
            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
9

10  PERRY BRUNO, individually, and on        Case No. 2:24-cv-01563
    behalf of other members of the general
11  public similarly situated,               **THIRD AMENDED**
                                             **CLASS ACTION COMPLAINT**
12           Plaintiff,
                                             (1)  Violation of Unfair Competition
13        vs.                                     Law (Cal. Business & Professions
                                                  Code §§ 17500 *et seq.*) and
14  BLUETRITON BRANDS, INC,                  (2)  Violation of Unfair Competition
                                                  Law (Cal. Business & Professions
15           Defendant.                           Code §§ 17200 *et seq.*)
                                             (3)  Violation of the Consumer Legal
16                                                Remedies Act (Cal. Civ. Code
                                                  § 1750 *et seq.*)
17

18

19                                           **Jury Trial Demanded**

20

21

22

23

24

25

26

27

28

Plaintiff PERRY BRUNO ("Plaintiff"), individually and on behalf of all other members of the public similarly situated, allege as follows:

## PRELIMINARY STATEMENTS

1.      This is an action for damages, injunctive relief, and any other available legal or equitable remedies, for violations of Unfair Competition Law (Cal. Business & Professions Code §§ 17500 *et seq.*, Unfair Competition Law (Cal. Business & Professions Code §§ 17200 *et seq.*, and the Consumer Legal Remedies Act (Cal. Civ. Code § 1750 et seq.)**,** resulting from the illegal actions of Defendant, in intentionally labeling its products with false and misleading claims that they are 100% Mountain Spring Water when Defendant's products contain microplastics. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction based on Defendant's removal of the action pursuant to 28 U.S.C. § 1332(d), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest or costs and is a class action in which members of the class are citizens of a State different from the Defendant.

3.      This court has personal jurisdiction over Defendant, because Defendant does business within the State of California and County of Los Angeles.

4.    Venue is proper in this Court because Defendant does business *inter alia* in the county of Los Angeles and a significant portion of the conduct giving rise to Plaintiff's Claims happened here.

## PARTIES

5.    Plaintiff is an individual and citizen of California, who was at all relevant times residing in Los Angeles, California.

6.    Defendant is a Delaware corporation whose principal place of business is located in Samford, Connecticut.

7.    At all times relevant hereto, Defendant was engaged in the manufacturing, marketing, and sale of bottled water products.

## FACTS COMMON TO ALL COUNTS

8.    During the Class Period Defendant sold Arrowhead bottled water (the "Products") labeled as with misleading "100%", labeling but which actually contain microplastics.

9.    Microplastics are small sized plastic particles that originate from manufacturing and physical degradation of plastics. Microplastics encompass a variety of different molecules with different structures, shapes, sizes, and polymers.

10.     Microplastics are not naturally occurring. Instead, microplastics are typically made from polypropylene, polyethylene, polystyrene, and other synthetic polymers.[1]

11.     Microplastics can leach into the water from the bottle or from manufacturing and bottling processes, and consumers are exposed to additives, processing aid, and unreacted monomers.[2]

12.     In 2018 Orb Media commissioned a global study on synthetic microplastic contamination in bottled water.[3] The study was performed at the Mason lab at State University of New York at Fredonia, Department of Geology & Environmental Sciences. The study tested 259 individual bottles from 27 different lots across 11 brands purchased from 19 locations in 9 countries. Ninety-three percent, ("93%"), of bottled water showed signs of microplastic contamination.

13.     Microplastic contamination in the Products is possible at various manufacturing levels and as a result of usage by reasonable consumers.[4]

---

[1] Md. Iftakharul Muhib, Md. Khabir Uddin, Md. Mostafizur Rahman, and Guilherme Malafaia, "Occurrence of microplastics in tap and bottled water, and food packaging: A narrative review on current knowledge," *Science of The Total Environment* (2022), http://dx.doi.org/10.1016/j.scitotenv.2022.161274.

[2] *Id; Winkler, A., Santo, N., Ortenzi,M.A., Bolzoni, E., Bacchetta, R., Tremolada, P., 2019. Does mechanical stress cause microplastic release from plastic water bottles? Water Res. 166, 115082*

[3] Orb Media, "Plus Plastic," Orb Media (2023), available at https://orbmedia.org/plus-plastic.

[4] See Md. Iftakharul Muhib, Md. Khabir Uddin, Md. Mostafizur Rahman, and Guilherme Malafaia, "Occurrence of microplastics in tap and bottled water, and food packaging: A narrative review on current knowledge," *Science of The Total Environment* (2022), http://dx.doi.org/10.1016/j.scitotenv.2022.161274.

14.    Toxic effects of microplastics on the physiology and behavior of marine invertebrates have been extensively documented.[5] Similar effects have also been observed in larger marine vertebrates such as fish. Furthermore, recent studies using mouse models have reported potential effects of Microplastics on mammalian gut microbiota, as well as cellular and metabolic toxicity in the host.[6] However, the pathophysiological consequences of acute and chronic exposure to microplastics in mammalian systems, particularly in humans, are not yet fully understood.[7]

15.    After being absorbed, microplastics have the potential to be transported through the circulatory system and subsequently accumulate in various organs, including the kidney, gut, and liver.[8] Thus, the effects on several blood and the immune system cell lines have been widely reported for several Microplastics. Moreover, Microplastics exhibit a "Trojan Horse" effect by absorbing and transporting various environmental pollutants.[9]

---

[5] Damià Barceló, Yolanda Picó, & Ahmed H. Alfarhan, *Microplastics: Detection in human samples, cell line studies, and health impacts*, Environmental Toxicology and Pharmacology (2023), https://doi.org/10.1016/j.etap.2023.104204; Grote, K., Brüstle, F., Vlacil, A.K., 2023. Cellular and systemic effects of micro- and nanoplastics in mammals—whatwe know so far. Materials 16, 3123. https://doi. org/10.3390/ma16083123;

[6] Yong, C.Q.Y., Valiyaveettil, S., Tang, B.L., 2020. Toxicity of microplastics and nanoplastics in mammalian systems. Int. J. Environ. Res. Public Health 2020 Vol. 17, 1509. https://doi.org/10.3390/IJERPH17051509.

[7] Damià Barceló, Yolanda Picó, & Ahmed H. Alfarhan, *Microplastics: Detection in human samples, cell line studies, and health impacts*, Environmental Toxicology and Pharmacology (2023), https://doi.org/10.1016/j.etap.2023.104204

[8] Id.

[9] Id.

16.     Studies indicate that exposure to microplastics through ingestion can lead to gastrointestinal problems such as irritable bowel syndrome; endocrine disruption such as adverse effects on hormonal balance and reproductive function; and cardiovascular problems such as increase of oxidative stress and impaired regular heart function.[10]

17.     Microplastics contamination is a material concern to Plaintiff and other reasonable consumers.

18.     Bottled water that is contaminated with microplastics is not "100%" Water.

19.     The Food and Drug Administration ("FDA") defines "spring water" as the name of water derived from an underground formation from which water flows naturally to the surface of the earth. 21 C.F.R. § 165.110 (2022).

20.     Additionally, the 21 C.F.R. § 165.110 only addresses the term "spring water" without any reference to "100%".

21.     The label "100%" is not the same as the label "Spring Water" or "Mountain Spring Water", because the label "100% Mountain Spring Water" includes the term "100%" which is not present in the labels "Spring Water" or "Mountain Spring Water."

---

[10] Ebuka Chizitere Emenike et al., *From Oceans to Dinner Plates: The Impact of Microplastics on Human Health*, Volume 9, issue 10, Heliyon, 2023, https://www.sciencedirect.com/science/article/pii/S240584402307648X

22.    Reasonable consumers, and Plaintiffs, understand that the term "100%" refers to percentage, a mathematical concept meaning part of a whole measured in hundredths.[11]

23.    Reasonable Consumers do not understand the term "100%" to mean "99%", "98%", "97%", or any other percentage except for "100%", in other words, reasonable consumers understand that one-hundred parts out of one-hundred parts does not mean some other number of parts less than one-hundred parts out of one-hundred parts.

24.    Reasonable consumers, like Plaintiff, do not expect microplastics to be in products with "100%" labeling.

25.    Reasonable consumers do not expect "100%" products to contain microplastics because the term "100%" indicates to consumers that all parts of the products, including all contents, will be Mountain Spring Water.

26.    Defendant's "100%"labeling conveys information beyond the federally approved "spring water" labeling.

27.    At the time that Plaintiff purchased the Products he observed the "100%" labeling, which led him to believe he was purchasing water of a superior quality to other bottled water brands without that labeling.

28.    Food is misbranded if it is false or misleading in any particular. Ca. Health and Saf. Code § 110660.

29.    The sale of misbranded food is expressly prohibited in California.

30.    The Products 100% labeling is false and misleading as the Products are not 100% Mountain Spring Water.

---

[11]    Common Parlance definition found at: https://www.merriam-webster.com/dictionary/percentage

31.    On October 19, 2022, Plaintiff purchased a Product labeled, marketed, and sold with "100%," labeling from a Walmart.

32.    During April, 2024, samples of Plaintiff's Products were analyzed by an independent expert using Fourier Transform Infrared Spectroscopy ("FTIR") microscopy to determine if the Products were contaminated with microplastics.

33.    The FTIR analysis determined that five of the six bottles tested contained microplastics. These microplastics were identified as epoxy resin, rubber, polyvinyl chloride, polypropylene, polyarylamide, polyvinyl alcohol, and a styrene based thermoplastic elastomer.

34.    21 C.F.R. § 165.110 only allows for chemical concentrations of chloride, iron, manganese, phenols, total dissolved solids, and zinc.

35.    21 C.F.R. § 165.110 does not provide for allowed concentrations of epoxy resin, rubber, polyvinyl chloride, polypropylene, polyarylamide, polyvinyl alcohol, and a styrene based thermoplastic elastomer.

36.    21 C.F.R. § 165.110 states that bottled water containing a substance at a level considered injurious to health under section 402(a)(1) of the Federal Food, Drug, and Cosmetic Act (the act), or that consists in whole or in part of any filthy, putrid, or decomposed substance, or that is otherwise unfit for food under section 402(a)(3) of the act is deemed to be adulterated, regardless of whether or not the

water bears a label statement of substandard quality prescribed by paragraph (c) of this section.

37.     California law prohibits the sale of adulterated food.

38.     Pursuant to California law, any food is adulterated if it consists in whole or in part of any diseased, contaminated, filthy, putrid, or decomposed substance, or if it is otherwise unfit for food. Ca., Health and Saf. Code - HSC § 110560.

39.     The Products are contaminated because they contain microplastics.

40.     The Products contain filthy substances because they contain microplastics.

41.     The Products are otherwise unfit for food because they contain microplastics.

42.     Defendant's sale of filthy, microplastic contaminated, unfit for food, spring water is prohibited by California law.

43.     Microplastics transport environmental contaminants like heavy metals and harmful bacteria into the intestines of people who consume them.[12]

44.      Microplastics are filth based on common parlance as they are dirty and unpleasant substances.[13]

---

[12] L. Hu, Y. Zhao & H. Xu, Trojan Horse in the Intestine: A Review on the Biotoxicity of Microplastics Combined Environmental Contaminants, 439 J. Hazard Mater. 129652 (2022), available at https://doi.org/10.1016/j.jhazmat.2022.129652.
[13]                     Filth,                 Oxford                 Learners                 Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/filth

45.     Reasonable consumers do not expect Products labeled as "100%" will be adulterated with filthy substances.

46.     Reasonable consumers do not expect Products labeled as "100%" will be adulterated with microplastic contamination.

47.     Irrespective of Defendant's "100%" labeling, reasonable consumers do not expect food sold for human consumption to be adulterated.

48.     Plaintiff, when he purchased the Products, believed based on Defendant's labeling that the Products would not be adulterated.

49.     Plaintiff, irrespective of Defendant's labeling, believes that products he purchases, including the Products, will not be adulterated if they are sold for human consumption.

50.     Plaintiff would not have purchased the Products if he had known they were adulterated.

51.     Plaintiff's Products contained microplastics despite having "100%" labeling.

52.     Persons, like Plaintiff herein, have an interest in purchasing products that do not contain false and misleading labels with regards to the contents of the Products.

53.     By making false and misleading claims about the Products, Defendant impaired Plaintiff's ability to choose the type and quality of products he chose to buy.

54.     Therefore, Plaintiff has been deprived of his legally-protected interest to obtain true and accurate information about his consumer products as required by law.

55.     As a result of Defendant's fraudulent labeling, Plaintiff and the class have been misled into purchasing products that did not provide them with the benefit of the bargain they paid money for, namely that the Products would not contain microplastics.

56.     Plaintiff regularly visits stores where Defendant's products are sold and will likely be exposed to Defendant's "100%" labeling in the future. However, unless Defendant is forced to correct the fraudulent labeling or remove the microplastics, Plaintiff will be unable to determine if Defendant's labeling accurately reflects the true contents of the Products.

57.     Plaintiff believes that "100%" water beverages are superior in quality to adulterated water beverages, and desires to purchase truly 100% water beverages as Defendant advertised the Products to be.

58.     If Defendant is not forced to correct the fraudulent labeling or remove the microplastics, Plaintiff will by unable to determine if Defendant's "100%", labeled products are actually "100%" water, depriving Plaintiff of his right to obtain true and accurate information regarding the consumer products he chooses to buy.

59.    The following are examples of the Products' fraudulent labeling:





60.    Plaintiff purchased the Products at Walmart. Plaintiff is aware of the Walmart Great Value brand. Plaintiff, when purchasing the Products, forwent purchasing the Great Value brand and instead purchased Defendant's Products because Defendant's Products contained "100%" labeling which led Plaintiff to believe Defendant's Products were premium Products.

61.    Arrowhead Products cost 1.2 cents per fluid ounce, meanwhile Great Value bottled water costs .9 cents per fluid ounce.

62.    Plaintiff willingly paid more for Defendant's Products because Defendant's Products contained "100%" labeling which led Plaintiff to believe that

Defendant's Products would be superior in quality to other products that did not contain that labeling.

63.     As a result of Defendant's fraudulent labeling, Plaintiff and the Class paid a price premium for a premium Product, but instead received a non-premium Product with Microplastics.

64.     Plaintiff and the Class purchased Defendant's Products because Defendant's advertising claimed that the Products were "100%" Water.

65.     When Plaintiff purchased the Products he read and relied upon Defendant's "100%" labeling to make his purchasing decision.

66.     Due to Defendant's intentional, deceitful practice of falsely labeling the Products as "100%" water when they are not, Plaintiff did not know that the Product contained microplastics when he purchased it.

67.     Plaintiff was unaware that the Product contained microplastics when he purchased it.

68.     Worse than the lost money, Plaintiff, the Class, and Sub-Class were deprived of their protected interest to choose the type and quality of products they ingest.

69.     Defendant, and not Plaintiff or the Class or Sub-Class, knew or should have known that labeling, marketing, and selling the Products as "100%" was false, deceptive, and misleading, and that Plaintiff, the Class, and Sub-Class members

would not be able to tell the Products contained microplastics unless Defendant expressly told them.

70.    As a result of Defendants' acts and omissions outlined above, Plaintiff has suffered concrete and particularized injuries and harm, which include, but are not limited to, the following:

  a.    Lost money;

  b.    Wasting Plaintiff's time; and

  c.    Stress, aggravation, frustration, loss of trust, loss of serenity, and loss of confidence in product packaging.

## CLASS ALLEGATIONS

71.    Plaintiff brings this action on behalf of himself and all others similarly situated, as a member of the proposed class (the "Class"), defined as follows:

> All persons within the United States who purchased the Products within four years prior to the filing of the Complaint through the date of class certification.

72.    Plaintiff also brings this action on behalf of himself and all others similarly situated, as a member of the proposed sub-class (the "Sub-Class"), defined as follows:

> All persons within California who purchased the Products within four years prior to the filing of this Complaint through to the date of class certification.

73.    Defendant, its employees and agents are excluded from the Class. Plaintiff does not know the number of members in the Class, but believes the members number in the thousands, if not more. Thus, this matter should be certified as a Class Action to assist in the expeditious litigation of the matter.

74.    The Class is so numerous that the individual joinder of all of their members is impractical. While the exact number and identities of their members are unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff is informed and believes and thereon alleges that the Class include thousands, if not millions of members. Plaintiff alleges that the class members may be ascertained by the records maintained by Defendant.

75.    This suit is properly maintainable as a class action because the Class and Sub-class are so numerous that joinder of their members is impractical and the disposition of their claims in the Class Action will provide substantial benefits both to the parties and the Court.

76.    There are questions of law and fact common to the Class affecting the parties to be represented. The questions of law and fact common to the Class predominate over questions which may affect individual class members and include, but are not necessarily limited to, the following:

a.    Whether the Defendant intentionally, negligently, or recklessly disseminated false and misleading information by labeling the Products with "100%" labeling;

b.    Whether the images on the Products are deceptive;

c.    Whether the Products contain microplastics;

d.    Whether Defendant's conduct was unfair and deceptive;

e.    Whether there should be a tolling of the statute of limitations; and

f.    Whether the Class is entitled to restitution, actual damages, punitive damages, and attorney fees and costs.

77.    As a resident of the United States and State of California who purchased the Products, Plaintiff is asserting claims that are typical of the Class and Sub-Class.

78.    Plaintiff has no interests adverse or antagonistic to the interests of the other members of the Class or Sub-Class.

79.    Plaintiff will fairly and adequately protect the interests of the members of the Class and Subclass. Plaintiff has retained attorneys experienced in the prosecution of class actions.

80.    A class action is superior to other available methods of fair and efficient adjudication of this controversy, since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford individual

litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous issues would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments and would magnify the delay and expense to all parties, and to the court system, resulting from multiple trials of the same complex factual issues. By contrast, the conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and of the court system and protects the rights of each class member. Class treatment will also permit the adjudication of relatively small claims by many class members who could not otherwise afford to seek legal redress for the wrongs complained of herein.

81.    The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other class members not parties to such adjudications or that would substantially impair or impede the ability of such non-party class members to protect their interests.

82.    Plaintiff's claims and injuries are identical to the claims and injuries of all class members, because all claims and injuries of all class members are based on the same fraudulent labeling and same legal theory. All allegations arise from the identical, false, and misleading packaging used by Defendants.

83.     Defendants have acted or refused to act in respect generally applicable to the Class thereby making appropriate final and injunctive relief with regard to the members of the Class and Sub-Class as a whole.

84.     The size and definition of the Class and Sub-Class can be identified through records held by retailers carrying and reselling the Products, and by Defendant's own records.

**FIRST CAUSE OF ACTION**
**Violation of the California False Advertising Act**
**(Cal. Bus. & Prof. Code §§ 17500 *et seq.*)**

82.     Plaintiff incorporates by reference each allegation set forth above in Paragraphs 1-81 as if fully articulated herein.

83.     Pursuant to California Business and Professions Code section 17500, *et seq.*, it is unlawful to engage in advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading...or...to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

84.     Defendant misled consumers by making misrepresentations about the Class Products, namely, Defendant sold the Products that were fraudulently labeled, and made false representations to Plaintiff and other putative class members in order to solicit these transactions.

85.     Specifically, Defendant sold Mountain Spring Water Products labeled with the term "100%,", which actually contain Microplastics.

86.     Defendant knew that their representations and omissions were untrue

and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiff and other Class Members.

87.    As a direct and proximate result of Defendant's misrepresentations, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property.  Plaintiff reasonably relied upon Defendant's representations regarding the Products, namely that the Products were of a superior quality to other bottled water. In reasonable reliance on Defendant's misrepresentations, Plaintiff and other Class Members purchased the Products.  In turn Plaintiff and other Class Members ended up with products that turned out to actually be different than advertised, and therefore Plaintiff and other Class Members have suffered injury in fact.

88.    Plaintiff alleges that these false and misleading representations made by Defendant constitute a "scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

89.    Defendant knew that the Class Products did in fact contain microplastics.

90.    Thus, Defendant knowingly sold Class Products to Plaintiff and other putative class members that contained false and misleading statements.

91.    The misleading and false advertising described herein presents a continuing threat to Plaintiff and the Class Members in that Defendant persists and continues to engage in these practices, and will not cease doing so unless and until forced to do so by this Court.  Defendant's conduct will continue to cause irreparable injury to consumers unless enjoined or restrained.  Plaintiff is entitled to preliminary and permanent injunctive relief ordering Defendant to cease their

false advertising, as well as disgorgement and restitution to Plaintiff and all Class Members Defendant's revenues associated with their false advertising, or such portion of those revenues as the Court may find equitable.

## SECOND CAUSE OF ACTION
### Violation of Unfair Business Practices Act
### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

92.    Plaintiff incorporates by reference each allegation set forth above in paragraphs 1-81 as if fully articulated here in.

93.    Actions for relief under the unfair competition law may be based on any business act or practice that is within the broad definition of the UCL. Such violations of the UCL occur as a result of unlawful, unfair or fraudulent business acts and practices. A plaintiff is required to provide evidence of a causal connection between a defendant's business practices and the alleged harm--that is, evidence that the defendant's conduct caused or was likely to cause substantial injury. It is insufficient for a plaintiff to show merely that the defendant's conduct created a risk of harm. Furthermore, the "act or practice" aspect of the statutory definition of unfair competition covers any single act of misconduct, as well as ongoing misconduct.

## UNFAIR

94.    California Business & Professions Code § 17200 prohibits any "unfair ... business act or practice." Defendant's acts, omissions, misrepresentations, and practices as alleged herein also constitute "unfair" business acts and practices within the meaning of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to

further Defendant's legitimate business interests, other than the conduct described herein. Plaintiff reserves the right to allege further conduct which constitutes other unfair business acts or practices. Such conduct is ongoing and continues to this date.

95.    In order to satisfy the "unfair" prong of the UCL, a consumer must show that the injury: (1) is substantial; (2) is not outweighed by any countervailing benefits to consumers or competition; and, (3) is not one that consumers themselves could reasonably have avoided.

96.    Here, Defendant's conduct has caused and continues to cause substantial injury to Plaintiff and members of the Class. Plaintiff and members of the Class have suffered injury in fact due to Defendant's decision to sell them fraudulently labeled products (Class Products). Thus, Defendant's conduct has caused substantial injury to Plaintiff and the Class.

97.    Moreover, Defendant's conduct as alleged herein solely benefits Defendant while providing no benefit of any kind to any consumer. Such deception utilized by Defendant convinced Plaintiff and members of the Class that the Products would be premium, in order to induce them to spend money on said Class Products. In fact, knowing that Class Products, by their objective terms were not "100% Mountain Spring Water" unfairly profited from their sale, in that Defendant knew that the expected benefit that Plaintiff would receive from this feature is nonexistent, when this is typically never the case. Thus, the injury suffered by Plaintiff and the members of the Class is not outweighed by any countervailing benefits to consumers.

98.    Finally, the injury suffered by Plaintiff and members of the Class are not an injury that these consumers could reasonably have avoided. After Defendant, falsely represented the qualities of Class Products consumers would

receive, the Plaintiff and Class Members suffered injury in fact due to Defendant's sale of Class Products to them. Defendant failed to take reasonable steps to inform Plaintiff and class members that the Class Products contained microplastics, including intentionally mislabeling the Products by using the term "100%". As such, Defendant took advantage of Defendant's position of perceived power in order to deceive Plaintiff and the Class members to purchase products containing fraudulent labels. Therefore, the injury suffered by Plaintiff and members of the Class is not an injury which these consumers could reasonably have avoided.

99.     Thus, Defendant's conduct has violated the "unfair" prong of California Business & Professions Code § 17200.

## FRAUDULENT

100.    California Business & Professions Code § 17200 prohibits any "fraudulent ... business act or practice." In order to prevail under the "fraudulent" prong of the UCL, a consumer must allege that the fraudulent business practice was likely to deceive members of the public.

101.    The test for "fraud" as contemplated by California Business and Professions Code § 17200 is whether the public is likely to be deceived. Unlike common law fraud, a § 17200 violation can be established even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage.

102.    Here, not only were Plaintiff and the Class members likely to be deceived, but these consumers were actually deceived by Defendant. Such deception is evidenced by the fact that Plaintiff agreed to purchase Class Products under the basic assumption that they were of premium quality. Plaintiff's reliance upon Defendant's deceptive statements is reasonable due to the unequal bargaining powers of Defendant and Plaintiff. For the same reason, it is likely that Defendant's fraudulent business practice would deceive other members of the public.

103.    As explained above, Defendant deceived Plaintiff and other Class Members by fraudulently labeling the Class Products.

104.    Thus, Defendant's conduct has violated the "fraudulent" prong of California Business & Professions Code § 17200.

### UNLAWFUL

105.    California Business and Professions Code Section 17200, et seq. prohibits "any unlawful…business act or practice."

106.    As explained above, Defendant deceived Plaintiff and other Class Members by labeling the Products as "100%" when in fact the Products contain Microplastics.

107.    Defendant used false advertising, marketing, and misrepresentations to induce Plaintiff and Class and Sub-Class Members to purchase the Class Products, in violation of California Business and Professions Code Section 17500, et seq.

108.    Had Defendant not falsely advertised, marketed or misrepresented the Class Products, Plaintiff and Class Members would not have purchased the Class Products. Defendant's conduct therefore caused and continues to cause economic harm to Plaintiff and Class Members. These representations by Defendant are therefore an "unlawful" business practice or act under Business and Professions Code Section 17200 *et seq*

109.    Defendant has thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiff and Class Members to judgment and equitable relief against Defendant, as set forth in the Prayer for Relief.  Additionally, pursuant to Business and Professions Code section 17203, Plaintiff and Class Members seek an order requiring Defendant to immediately cease such acts of unlawful, unfair, and fraudulent business practices and requiring Defendant to correct its actions.

**COUNT III**
**VIOLATIONS OF CONSUMER LEGAL REMEDIES ACT**
**(Cal. Bus. & Prof. Code §§ 1750 *et seq.*)**
**On behalf of the Class and Sub-Class**

110.    Plaintiffs incorporate all of the allegations and statements made in paragraphs 1 through 81 above as if fully reiterated herein.

111.    Defendants' actions as detailed above constitute a violation of the Consumer Legal Remedies Act, Cal. Civ. Code §1770, to the extent that Defendants violated the following provisions of the CLRA:

a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; Cal. Civ. Code § 1770(5);

b.    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; Cal. Civ. Code § 1770(7);

c.    Advertising goods or services with intent not to sell them as advertised; Cal. Civ. Code §1770(9);

d.    Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; Cal. Civ. Code §1770(14); and

e.    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not; Cal. Civ. Code §1770(16);

112.    On or about January 24, 2024, through his Counsel of record, using certified mail with a return receipt requested, Plaintiff served Defendant with notice of their violations of the CLRA, and asked that Defendant correct, repair, replace, or otherwise rectify the goods and services alleged to be in violation of the CLRA; this correspondence advised Defendant that it must take such action within thirty (30) calendar days, and pointed Defendant to the provisions of the CLRA that Plaintiffs believe to have been violated by Defendant. Defendant has not replied to this notice letter with a letter dated on or before February 24, 2024, and thus refused to adequately correct, repair, replace, or otherwise rectify the issues raised therein

## MISCELLANEOUS

113.    Plaintiff and Class Members allege that they have fully complied with all contractual and other legal obligations and fully complied with all conditions precedent to bringing this action or all such obligations or conditions are excused.

## REQUEST FOR JURY TRIAL

114.    Plaintiff requests a trial by jury as to all claims so triable.

## PRAYER FOR RELIEF

115.    Plaintiff, on behalf of himself and the Class, requests the following relief:

(a)    An order certifying the Class and appointing Plaintiff as Representative of the Class;

(a)    An order certifying the undersigned counsel as Class Counsel;

(b)    An order requiring Defendant, at its own cost, to notify all Class Members of the unlawful and deceptive conduct herein;

(c)    An order requiring Defendant remove microplastics from its Products prior to sale;

(d)    Actual damages suffered by Plaintiff and Class Members as applicable or full restitution of all funds acquired from Plaintiff and Class Members from the sale of misbranded Class Products during the relevant class period;

(e)    Punitive damages, as allowable, in an amount determined by the Court or jury;

(f)    Any and all statutory enhanced damages;

(g)    All reasonable and necessary attorneys' fees and costs provided by statute, common law or the Court's inherent power;

(h)    Pre- and post-judgment interest; and

(i)    All other relief, general or special, legal and equitable, to which Plaintiff and Class Members may be justly entitled as deemed by the Court.

Dated:  August 23, 2024         Respectfully submitted,

By:   /s/ Todd M. Friedman
        Todd M. Friedman
        Law Offices of Todd M. Friedman, P.C.
        Attorney for Plaintiff

## **PROOF OF SERVICE**

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause. On August 23, 2024, I served a true copy of the First Amended Class Action Complaint on all counsel of record via the ECF Filing System: Executed on August 23, 2024.

[X] I hereby certify that I am a member of the Bar of the United States District Court, Central District of California.

[  ] I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

[X] I hereby certify under the penalty of perjury that the foregoing is true and correct.

By:    /s/ Todd M. Friedman
       Todd M. Friedman, Esq.
       Attorney for Plaintiff